Filed 10/22/25  In re S.K. CA2/8

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION EIGHT

| | |
|---|---|
| In re S.K. et al., Persons Coming Under the Juvenile Court Law. | B342576 |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES,<br><br>　　　Plaintiff and Respondent,<br><br>　　v.<br><br>N.W.,<br><br>　　　Defendant and Appellant. | (Los Angeles County Super. Ct. No. 18LJJP00487FGHIJ) |

APPEAL from an order of the Superior Court of Los Angeles County, Syna N. Dennis, Judge Pro Tempore.  Affirmed.

Lillian Hamrick, under appointment by the Court of Appeal, for Defendant and Appellant.

Dawyn R. Harrison, County Counsel, Kim Nemoy, Assistant County Counsel, and Melania Vartanian, Deputy County Counsel, for Plaintiff and Respondent.

—————————————

**SUMMARY**

N.W. (Mother) appeals from the trial court's finding that the Los Angeles County Department of Children and Family Services (DCFS) provided her with reasonable reunification services at a six-month review hearing pursuant to Welfare and Institutions Code section 266.21, subdivision (e).[1]  We conclude that substantial evidence supports the court's finding, by clear and convincing evidence, that DCFS provided reasonable services to Mother, where DCFS remained in reasonable contact with Mother and made reasonable efforts to assist Mother in areas where compliance proved difficult.  We affirm the trial court's finding that reasonable services were provided.

**FACTUAL AND PROCEDURAL BACKGROUND**

**A. DCFS Referral and Initial Investigation**

In late July 2023, DCFS received a referral that Mother left her five children,[2] ages four to thirteen, alone in the home for three weeks.  The caller reported the living conditions were "horrible" with feces and trash everywhere.  Law enforcement went to the home, but neither Mother nor any of the children were present.

A children's social worker (CSW) spoke with a paternal aunt, who reported the two youngest children, ages six and four, were living with her.  The aunt reported that she had not spoken to Mother since June 2023, when Mother dropped off the

---

[1]     All further undesignated statutory references are to the Welfare and Institutions Code.

[2]     The juvenile court made paternity findings for each of the children and identified four different fathers for the five children.  None of the court's findings or orders regarding the fathers are the subject of this appeal.

2

youngest child. The aunt also reported that Mother's landlord informed her the three oldest children had been left alone for three weeks, and one of the children (aged nine) was banging on the door and crying that she was hungry. The CSW was told that maternal grandfather had picked up the three oldest children. The CSW observed the two youngest children with paternal aunt and spoke with Germany L., the six-year old. Germany reported that "she does not feel safe at home with her mom because mom leaves for a long time."

The CSW was told that the three older children had been staying with various friends and family members for the past several weeks, but the three oldest children and Mother could not be located at the time of the initial investigation. The CSW learned that the children were previously declared dependents of the juvenile court in 2018 based in part on Mother's substance abuse and domestic violence between Mother and one of the fathers. The juvenile court terminated jurisdiction in 2020 and 2021 and granted sole physical and legal custody to Mother. The prior case was initiated by a referral that the children were left home alone without supervision.

On August 10, 2023, the juvenile court authorized removal orders to detain all of the children from Mother.

**B. Detention and Arraignment Hearings**

On August 14, 2023, DCFS filed a petition as to the five children, pursuant to section 300, subdivisions (b)(1) and (j)(1). DCFS alleged that the "home was found to be in a filthy, unsanitary, and hazardous condition" and Mother "left the children . . . home alone for an extended period of time, in the home, and the mother's whereabouts were unknown." DCFS also alleged that Mother "failed to make an appropriate plan for the

children's ongoing care and supervision, and failed to provide the children with the necessities of life including food, clothing, shelter, and medical care."

At the detention hearing the following day, counsel for DCFS and the two youngest children appeared. The court ordered the children detained from Mother and their respective fathers and issued protective custody warrants for the three older children and an arrest warrant for Mother. On September 19, 2023, the three older children were located at school and detained.

The Dependency Investigator (DI) made multiple contacts with family members and friends and attempted to reach Mother at all telephone numbers and email addresses that were provided, but Mother did not respond. Mother appeared at the arraignment hearing on September 26, 2023 and was appointed counsel.

### C. DCFS Ongoing Investigation

During the investigation, the DI was provided with a notarized affidavit from Mother, signed on July 2, 2023 and notarized on August 25, 2023. The affidavit states: "I, [Mother], am signing over temporary guardianship over to Lashawnda J[.] for Semaj K[.], Eden N[.], and Eunique G[.] until further notice. My children have been in Lashawnda J[.'s] care since July 2, 2023. I am dealing with severe PTSD at the moment am unable to care for them." Lashwanda J. is a paternal relative of Semaj.

After Mother appeared, the DI interviewed Mother regarding the allegations. Mother stated: "I am not in a place to take care of them right now because I'm really going through it." Mother told the DI, "I just know it's PTSD and feel like I'm severely depressed. I have a lot of downtime mentally and I can't

4

handle it.  I went to my doctor and he gave me meds because my heart was always racing."  Mother reported that she is no longer taking the medication and she could not recall the name of the medication she was taking.  She further noted that she had not followed up with her doctor in three to four months regarding her mental health concerns.

Mother also stated: "I believe it's all due to stress.  I have nightmares and dreams that I see my mom and that I'm going outside to smoke a cigarette with her.  Sometimes I'm not even sleeping when I see her.  That's not regular stuff.  I'm so overwhelmed.  It's hard for a family to operate with two parents so imagine me as a single parent trying to do it all on my own and having these problems."  Mother reported that she had been exhibiting these behaviors for the past nine months.

Mother reported to the DI that she had been struggling with depression and anxiety although she was never formally diagnosed.  She reported that her mother passed away in 2021 and she had been struggling to cope with her loss.  Mother reported seeing a therapist in the past for two years.  She reported she stopped attending as she believed she had met the goals she set out to accomplish.

After speaking with Mother, DCFS filed an amended petition on October 10, 2023, adding allegations that Mother "has mental and emotional problems, including Post Traumatic Stress Disorder and exhibits hallucinations, paranoia, nightmares and heart palpitations which renders the mother incapable of providing regular care for the children."  DCFS further alleged that Mother failed to obtain recommended mental health treatment.

### D. Adjudication and Disposition

The adjudication and disposition hearings took place on February 26, 2024. Between the filing of the amended petition and the February hearing, Mother tested positive for marijuana on one occasion and missed drug testing in January and February.

The court sustained counts b-2, b-3, and b-4, finding that Mother failed to make an appropriate plan for the two youngest children by leaving them with an aunt, failed to provide the necessaries of life, and failed to provide appropriate parental care and supervision for the children by leaving them home alone for extended periods of time. The court also found that Mother's mental and emotional problems endangered the children's health and safety.

The court removed the children from Mother and their respective fathers. The two youngest children were placed with their paternal aunt, and the three older children were placed with a family friend. The court ordered reunification services for Mother and ordered Mother to complete the following programs: random and on-demand drug and alcohol testing, and if Mother had any unexcused, missed or dirty tests, she was to participate in a full drug treatment program with 12-Step, court card, sponsor, and aftercare; psychiatric evaluation, and take all prescribed psychotropic medication; parenting program; individual counseling to address case issues including child safety and how drugs affect children; follow-up with mental health treatment as recommended. Mother was also given

6

monitored visits with the children three times per week for three hours each, for a total of nine hours.[3]

A progress hearing was set for April 25, 2024, and the six-month review hearing was set for August 26, 2024.

### E. Mother's Compliance with Her Case Plan

Even before the February 26, 2024 hearing at which the court ordered reunification services, the CSW provided Mother with a referral packet for individual counseling, grievance support group, parenting education, and the Bringing Families Home Program. Mother was also referred to random drug testing. Mother missed testing on February 6, February 21, and March 29 and tested positive for marijuana on March 15, 2024.

Prior to the April 25, 2024 progress hearing, Mother was given referrals for a psychiatric evaluation, but Mother did not report any progress in seeking an evaluation or any information as to any prescribed psychotropic medications.

Mother reported that she enrolled in a 12-week parenting course at Desert Vineyard and individual counseling. The CSW contacted the therapist on two occasions but was unable to confirm Mother's individual counseling because Mother had not signed consent forms. The CSW informed Mother she needed to sign the consent forms. A few weeks later, Mother informed the CSW that she was not attending the parenting class at Desert Vineyard, and the CSW provided Mother with a referral to a different parenting class at Grace Resources. Mother indicated she enrolled in the parenting class at Grace Resources, but the CSW was unable to confirm her enrollment.

---

[3] On August 13, 2025, DCFS's Motion to Augment was granted and the record was augmented with the Court-Ordered Case Plan for Mother dated February 26, 2024.

7

Mother advised the CSW that three-hour visits were too long, so her visits were shortened to two hours. Mother regularly complained about visitation rules, including the requirement to confirm her visits the day before and the location of the visits. Mother did visit with the children regularly, but her behavior was often volatile, she used foul language, and on more than one occasion, Mother threatened the caregiver and the caregiver's children. The CSW reported that Mother and the children enjoy being in each other's company.

At the April 25, 2024 progress hearing, the juvenile court reviewed Mother's progress. Mother's counsel reiterated that Mother had enrolled in counseling and would sign the consent forms so DCFS could get confirmation before the six-month review hearing. Mother was present at the hearing. The court reminded Mother of the order for drug testing and encouraged Mother to contact the social worker if she needed assistance, and the court ordered Mother to sign releases so DCFS could confirm her program enrollment.

Between the April 25, 2024 progress hearing and the six-month review hearing on August 26, 2024, Mother missed five drug testing appointments and tested positive for marijuana on June 11, 2024. Mother did not have any clean drug tests. Mother reported no progress on the psychiatric evaluation. Mother reported that she stopped attending the parenting course at Grace Resources and was now attending a class at Parent Anonymous. The CSW was unable to confirm Mother's enrollment with the instructor, and Mother did not provide the CSW with an enrollment letter.

Mother continued to visit with the children, although she routinely failed to confirm visits, so numerous visits were

cancelled.  At the visits, Mother was attentive and engaged with the children.  At times, the CSW had difficulty reaching Mother.  Mother did not always answer her phone, or would tell the CSW she was busy and would call back, but Mother did not always call back.  DCFS reported that Mother's lack of communication made it difficult for DCFS to identify possible barriers to reunification.

At the August 2024 six-month review hearing, DCFS recommended continued reunification services for Mother.  Mother requested a contested hearing, which took place on October 22, 2024.  Prior to the contested hearing, DCFS delivered "Title XX's"[4] from November 7, 2023 to August 26, 2024.

## F. Contested Six-Month Review Hearing

At the contested hearing, CSW Ramos was called as the only witness.  CSW Ramos testified that she monitored many of Mother's visits and spoke to Mother about her case plan at those visits.  Mother's counsel asked CSW Ramos if her duties in documenting delivered services were reflected in the service logs.  CSW Ramos replied, "[t]here might be certain things that I had forgotten to put on there, but most of the important things I believe are there documented."

CSW Ramos testified that she provided Mother with referrals at least three different times and Mother was aware that she had to enroll in mental health services, a parenting class, and drug testing.  CSW Ramos was asked if she would provide Mother with an alternate referral if she was placed on a waiting list for any services.  CSW Ramos replied that as far as

---

[4]      As noted in several unpublished cases, "Title XX's" refer to DCFS's case activity logs setting forth all contacts, services and visits.  (See, e.g., *In re Marco W.* (Dec. 12, 2012, B238471) [nonpub. opn.].)

she was aware, Mother never reported that she was waitlisted. CSW Ramos also confirmed that she told Mother she needed to sign releases so she could speak to her therapist, and Mother told her she would "take care of it." CSW Ramos testified that she spoke to Mother a few times about how to get a mental health assessment. When asked if this information was reflected in the service logs, CSW Ramos testified that she was not sure if it was reflected in the service logs. CSW Ramos testified that Mother never asked for funds for any reason. She also testified that she had not been able to contact Mother in over two months.

In addition to CSW Ramos's testimony, the court admitted into evidence the reports prepared by DCFS for prior hearings and the Title XX service logs from November 7, 2023 to August 26, 2024.

At the conclusion of the six-month review hearing, Mother argued that DCFS did not make reasonable efforts for her to reunify with her children. DCFS argued that reasonable services were provided and Mother's lack of communication made it difficult for DCFS to fully assist Mother. DCFS also noted that Mother missed several drug tests and tested positive at others; she began and then stopped parenting classes; she had not enrolled in a mental health evaluation; and had never indicated that there was a financial issue or requested any funds from DCFS.

The juvenile court found that continued jurisdiction under section 300 was necessary because the conditions justifying jurisdiction still existed. The court found that returning the children to their parents' custody would create a substantial risk of detriment and that out-of-home placement remained appropriate. The court found by clear and convincing evidence

that DCFS provided reasonable services.  The court found CSW Ramos credible and stated:  "It's clear to the court that everything that the social worker did was not documented in the Title XX's, but it's also clear to the court that, just because the services provided were not documented, doesn't mean that the services weren't provided."  The court also found Mother to be in partial compliance with her case plan and ordered continued reunification services.

Mother filed an application for rehearing, and on November 14, 2024, the court denied Mother's application.  Mother then filed this timely appeal.

## DISCUSSION

### I.  Mother's Appeal of the Reasonable Services Finding is Proper

Mother specifically appeals the juvenile court's finding that DCFS made reasonable efforts at the six-month review hearing.

Prior cases questioned whether a parent can appeal a reasonable services finding.  "[W]e conclude that there is no right to appeal a finding that reasonable reunification services were provided to the parent or legal guardian unless the court takes adverse action based on that finding, because, in the absence of such action, there is no appealable order resulting from that finding." (*Melinda K. v. Superior Court* (2004) 116 Cal.App.4th 1147, 1154.)  The court in *Melinda K.* concluded that "a petition for writ of mandate is the appropriate method by which to challenge a finding made by a juvenile court at a review hearing which does not result in an appealable order." (*Id*. at p. 1157.)

Subsequent cases recognized the potential negative impact of an erroneous reasonable services finding.  "[A] parent or child can [be] aggrieved by a reasonable services finding at the time of

11

the six-month review hearing if it is not supported by substantial evidence.  Such a finding can put the interests of parents and children in reunification at a significant procedural disadvantage." (*In re T.G.* (2010) 188 Cal.App.4th 687, 695.) As a result, our colleagues in Division Two recently held that a parent may challenge a reasonable services finding by way of a direct appeal rather than a writ of mandate.  "Because a parent is aggrieved by an erroneous reasonable services finding, the parent may obtain appellate review of the finding by appealing the order in which it was made, even if the parent is not challenging any other part of that order." (*In re A.O.* (2025) 111 Cal.App.5th 1048, 1061.)  Thus, we conclude that Mother's appeal is proper.

## II.    Substantial Evidence Supports the Court's Reasonable Services Finding

At the six-month review hearing, the juvenile court "shall order the return of the child to the physical custody of their parent or legal guardian unless the court finds, by a preponderance of the evidence, that the return of the child to their parent or legal guardian would create a substantial risk of detriment to the safety, protection, or physical or emotional well-being of the child." (§ 366.21, subd. (e)(1).)  "If the child is not returned to their parent or legal guardian, the court shall determine by clear and convincing evidence whether reasonable services that were designed to aid the parent or legal guardian in overcoming the problems that led to the initial removal and the continued custody of the child have been provided or offered to the parent or legal guardian." (§ 366.21, subd. (e)(8).)

"When a finding that reunification services were adequate is challenged on appeal, we review it for substantial evidence." (*In re Alvin R.* (2003) 108 Cal.App.4th 962, 971 (*Alvin R.*).)

12

"In general, when presented with a challenge to the sufficiency of the evidence associated with a finding requiring clear and convincing evidence, the court must determine whether the record, viewed as a whole, contains substantial evidence from which a reasonable trier of fact could have made the finding of high probability demanded by this standard of proof." (*Conservatorship of O.B.* (2020) 9 Cal.5th 989, 1005.)

To support a finding that reasonable services were provided, "the record should show that the supervising agency identified the problems leading to the loss of custody, offered services designed to remedy those problems, maintained *reasonable* contact with the parents during the course of the service plan, and made *reasonable* efforts to assist the parents in areas where compliance proved difficult." (*In re Riva M.* (1991) 235 Cal.App.3d 403, 414.) "When the sufficiency of the evidence to support a finding or order is challenged on appeal, even where the standard of proof in the trial court is clear and convincing evidence, the reviewing court must determine if there is any substantial evidence—that is, evidence which is reasonable, credible and of solid value—to support the conclusion of the trier of fact." (*In re Jasmine C.* (1999) 70 Cal.App.4th 71, 75.)

Here, substantial evidence supports the juvenile court's findings. DCFS identified the problems leading to the loss of custody. The court sustained the section 300 petition in February 2024 by finding that Mother failed to make an appropriate plan for her children by leaving them with a relative, failed to provide the necessaries of life, and failed to provide appropriate parental care and supervision for her children by leaving them home alone for extended periods of time. In addition, the court found that

13

Mother's mental and emotional problems endangered the children's health and safety.

Mother's case plan specifically offered services designed to remedy these problems. Mother was ordered to complete a psychiatric evaluation and participate in individual counseling to address her underlying mental health issues. She was ordered to participate in a parenting class to address her failure to provide the necessaries of life for her children and failure to provide appropriate care and supervision for her children. In addition, due to Mother's prior substantiated history of substance abuse and her positive drug test before the disposition hearing, Mother was ordered to participate in random and on-demand drug testing. All of these programs were designed to remedy the problems that led to the loss of custody.

CSW Ramos maintained reasonable contact with Mother during the course of the service plan. CSW Ramos monitored visits with Mother and she testified that she provided Mother with referrals at least three different times and spoke to Mother about her progress with the programs. In addition, CSW Ramos testified that she advised Mother to sign releases so DCFS could confirm her participation in a parenting class and individual counseling, and Mother told her she would "take care of it." CSW Ramos also testified that she spoke to Mother a few times about how to get a mental health assessment. Notwithstanding these contacts, DCFS reported that Mother's lack of communication made it difficult for DCFS to identify possible barriers to reunification. CSW Ramos testified that she had not been able to contact Mother in over two months.

Mother argues that some of these discussions are not reflected in the service logs. However, the court found CSW

Ramos's testimony credible and specifically stated: "[J]ust because the services provided were not documented, doesn't mean that the services weren't provided." Witness credibility is the sole province of the trial court. "It is axiomatic that an appellate court defers to the trier of fact on such determinations, and has no power to judge the effect or value of, or to weigh the evidence; to consider the credibility of witnesses; or to resolve conflicts in, or make inferences or deductions from the evidence. We review a cold record and, unlike a trial court, have no opportunity to observe the appearance and demeanor of the witnesses. 'Issues of fact and credibility are questions for the trial court.' " (*In re Sheila B.* (1993) 19 Cal.App.4th 187, 199–200, quoting *In re Kristin W.* (1990) 222 Cal.App.3d 234, 251, internal citation omitted.)

The juvenile court acted within its discretion to base its finding on CSW Ramos's oral testimony, notwithstanding the fact that not all interactions between CSW Ramos and Mother were documented in the service logs. "[T]he testimony of one witness is sufficient to support a finding of fact and this court cannot overturn the findings even though other evidence is to the contrary." (*Western Tire Co. v. Furstman* (1968) 268 Cal.App.2d 446, 450.)

DCFS also made reasonable efforts to assist Mother in areas where compliance proved difficult. Mother argues that DCFS did not take the necessary steps to help Mother complete the psychiatric assessment or access further services. But CSW Ramos testified that she spoke to Mother a few times about how to get a mental health assessment.

Mother also argues there was no evidence DCFS followed up with Mother's individual therapist, assisted Mother in

submitting the necessary consent forms, or offered alternative referrals. The record does not support this argument. The CSW contacted Mother's therapist on at least two occasions but was unable to confirm Mother's individual counseling because Mother had not signed consent forms. The CSW informed Mother she needed to sign the consent forms, and the trial court ordered Mother to sign the consent forms, but there was no evidence Mother signed the forms before the six-month review hearing. CSW Ramos also offered alternative referrals when Mother stopped attending parenting classes with the suggested providers. There was no evidence Mother was ever placed on a waiting list for services.

In *In re Alvin R.*, on which Mother heavily relies, the Court of Appeal found insufficient evidence to support the trial court's finding that reasonable services were provided where the father had fully complied with his case plan and the remaining barrier to reunification was regular visitation with his eleven-year-old son. The case plan set up a domino effect of services, requiring the minor to participate in eight sessions of individual counseling, after which the therapist could approve participation in conjoint counseling with father and the minor, after which the minor could agree to visits with father. (*Alvin R., supra,* 108 Cal.App.4th at p. 967.) The juvenile court recognized that until the minor participated in conjoint therapy, the minor was unlikely to agree to visits with father. (*Id.* at p. 968.)

At a contested six-month review hearing, nearly eight months after adjudication and disposition, the father and minor had not yet attended one conjoint counseling session. The minor did not attend any individual counseling sessions for five months. DCFS argued that the delay in counseling was due to the minor's

16

caregiver, who requested a therapist closer to home to manage her challenging schedule.  DCFS also conceded that the minor was placed on a waiting list for a therapist.  The trial court found that reasonable services were provided, but the Court of Appeal reversed that finding.

"Father had done all that was required of him under the plan.  Thus, *one* service, getting Alvin into eight sessions of individual therapy, stood in the way of all measures remaining under the reunification plan, and the Department submitted no evidence of having made a good faith effort to bring those sessions about. . . . And there was no evidence with regard to any follow-up by the Department to move things along or to assist the overwhelmed [caregiver] in any respect other than a referral to a therapist with a waiting list." (*Alvin R., supra,* 108 Cal.App.4th at p. 973; s*ee also T.J. v. Superior Court* (2018) 21 Cal.App.5th 1229, 1242, disapproved on another ground in *Michael G. v. Superior Court* (2023) 14 Cal.5th 609 ["Maintaining Mother on a waiting list was not equivalent to 'providing' or 'offering' services."].)  Here, there was no evidence that any delays in Mother's case plan were due to Mother or minors being placed on a waiting list.

Mother also argues that DCFS failed to address her transportation and housing barriers.  Again, the record does not support this argument.  Mother reported to DCFS that housing was her biggest barrier on November 30, 2023.  But in April 2024, Mother reported that she had moved to a new apartment in Lancaster and was now closer to her children.  Thus, Mother appears to have addressed her own housing and transportation issues nearly six months before the contested six-month review hearing on October 22, 2024.  In addition, CSW Ramos testified

17

that Mother never asked for funds for any reason.  There is no evidence that housing or transportation barriers prevented Mother from complying with her case plan from April to October 2024.

"The standard is not whether the services provided were the best that might be provided in an ideal world, but whether the services were reasonable under the circumstances." (*In re Misako R.* (1991) 2 Cal.App.4th 538, 547.)  We find that substantial evidence supports the court's finding by clear and convincing evidence that DCFS provided reasonable reunification services to Mother.

## DISPOSITION

The court's order is affirmed.

UZCATEGUI, J.*

We Concur:

STRATTON, P. J.

WILEY, J.

---

*        Judge of the Los Angeles County Superior Court, appointed by the Chief Justice pursuant to article VI, section 6 of the California Constitution.